UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
NANCY RUHLING,

                                    Plaintiff,

                                                                **OPINION AND ORDER**

                    -against-                                   CV 04-2430 (ARL)

TRIBUNE COMPANY, et al.,

                                    Defendants.
-------------------------------------------------------X
**LINDSAY, Magistrate Judge:**

        Before the court is a motion for summary judgment by the defendants Tribune Company

and Newsday, Inc., (together, "Defendants") pursuant to Fed. R. Civ. P. 56.  The parties have

consented to the undersigned exercising plenary jurisdiction over this action pursuant to 28

U.S.C. § 636 (c).  For the reasons set forth below, the defendants' motion for summary judgment

is granted in part and denied in part.

I.      FACTS

        A.      Employment History

        Plaintiff, who was born in 1956, began her employment with Newsday (a subsidiary of

the Tribune Company) in 1984 as an Assistant Editor in its Melville, New York office.  (Def. R.

56.1 Statement at ¶¶ 3-4; Suppl. Compl. at ¶ 5; Pl. R. 56.1 Statement at ¶¶ 2-3).[1]  According to

the plaintiff, shortly after commencing her employment with Newsday in 1984, she was sexually

harassed by a supervisor and she immediately reported that harassment internally to Newsday.

(Suppl. Compl. at ¶¶ 17-18).  Plaintiff continued to work as an Assistant Editor until she resigned

on May 9, 2005.  (Id. at ¶¶ 12-13).  Between 1984 and March 17, 2002, the plaintiff was assigned

_____

        [1]The facts set forth in the defendants' Rule 56.1 Statement that are cited to by the court
have been admitted by the plaintiff.

to work on Newsday's Night News Desk.  (Def. R. 56.1 Statement at ¶ 22; Suppl. Compl. at ¶ 12).  During that time, her assigned work schedule was Saturday through Wednesday from 4:30 p.m. to 12:00 a.m.  (Def. R. 56.1 Statement at ¶ 22).  In addition to her work as an Assistant Editor, plaintiff often wrote articles on a freelance basis for publication in Newsday.  (Id. at ¶ 15).

        B.      The "Buyout"

In January 2002, Newsday offered its senior employees a voluntary early retirement program, referred to as a "buyout. "  (Id. at ¶ 17).  The buyout, which expired February 28, 2002, was offered to the plaintiff.  (Suppl. Compl. at ¶ 25).  Plaintiff elected not to take the buyout choosing instead to continue her employment at Newsday.  (Def. R. 56.1 Statement at ¶ 18).  Her problems at Newsday began shortly after she made that choice.

Immediately following the expiration of the buyout, plaintiff was notified that she was to be transferred to the Features Desk and that her work schedule would be changed.  (Id. at ¶ 23).  The Features section of the newspaper is dedicated to reporting on lifestyles, arts and entertainment.  (Id. at ¶ 20).  Plaintiff objected to the transfer both because she considered features to be a less prestigious assignment and because she would be required to work a "daytime" schedule of Sundays from 9:30 a.m. to 4:00 p.m. and Monday through Thursday from 12:30 p.m. to 8:00 p.m.  (Id. at ¶29).  She was nonetheless assigned to the Features Desk until May 2005 and  reported to Jack Millrod, Newsday's Executive News Editor.  (Id. at ¶ 23).

In May 2002, plaintiff was contacted by Stephanie Abrutyn, Senior Counsel at the Tribune, regarding one of plaintiff's freelance articles that had been published in Newsday.  (Id. at ¶ 42).  The article had been posted on an outside website without Newsday's permission.  (Id.

at ¶ 43).  Abrutyn sent a letter to the website owner demanding that they stop posting plaintiff's article as it was the intellectual property of Newsday.  (Id. at ¶ 44).  Abrutyn was informed that the website had received plaintiff's permission to post the article.  (Id.).  Abrutyn then contacted plaintiff advising her that Newsday owned the copyright to articles published in Newsday and that plaintiff could not grant a third-party permission to publish those articles notwithstanding her authorship.  (Id. at ¶ 45).  Plaintiff, who had been submitting freelance articles to Newsday for years, informed Abrutyn that this represented a change in Newsday's policy and that previously she had been permitted to authorize the publication of her own articles as long as Newsday was credited as the original publisher.  (Id.¶ 45; Pl. R. 56.1 Statement at ¶37).  Abrutyn informed plaintiff that Newsday would no longer accept her freelance articles unless she signed an agreement acknowledging Newsday's sole ownership rights.  (Def. R. 56.1 Statement at  ¶¶ 47, 50).  Plaintiff asserts that she alone was required to sign such an agreement.  (Pl. R. 56.1 Statement at ¶40).  Although she signed the agreement, she stopped submitting freelance articles to Newsday.  (Def. R. 56.1 Statement at ¶ 50).

C.    Plaintiff's Repetitive Stress Injury

In December 2002, plaintiff's schedule was again changed.  (Id. at ¶ 32).  Her schedule was moved from Sunday to Thursday to Monday through Friday.  (Id.).  Plaintiff claims that Millrod chose to change plaintiff's schedule over a male colleague as a reward for the latter's "personal loyalty" and participation in the company's co-ed softball team.  (Pl. R. 56.1 Statement at ¶¶ 28, 31).  Plaintiff complained to Tony Marro, then-Newsday's Editor, about the schedule change charging that Millrod showed "favoritism" to persons loyal to him.  (Def. R. 56.1 Statement at ¶ 36).  Coincidentally, at this same time, plaintiff claimed to have suffered a

recurrence of a repetitive stress injury (RSI), a condition she alleged resulted from her employment with Newsday. (Id. at ¶ 67). According to plaintiff, her RSI generated pain in her arms and shoulders making tasks such as carrying a briefcase, typing on a keyboard and sleeping on the affected side of her body more difficult. (Ruhling Dep. at 149-51). In December, 2002 and January 2003, explaining that her RSI prevented her from doing the keystrokes, plaintiff did not comply with several requests that she edit articles. (Def. R. 56.1 Statement at ¶ 69; Pl. R. 56.1 Statement at ¶ 54). Notwithstanding this explanation, plaintiff was issued a written reprimand for failing to complete these tasks. (Def. R. 56.1 Statement at ¶ 70). On January 30, 2003, after being reprimanded, plaintiff sought treatment for her RSI. (Id. at ¶ 73). Her doctor cleared her to continue working, but recommended that she take regular work breaks and undergo a course of physical therapy two times per week for four weeks. (Id. at ¶ 73, Ruhling Dep. Ex. 7).

In February 2003, Ruhling asked Newsday to temporarily change her work schedule back to include Sundays so that she could have a weekday off to go for physical therapy. (Def. R. 56.1 Statement at ¶ 74). As an option, plaintiff proposed that she be permitted to report to work one-hour later two days per week for one month so she could seek therapy before work. Newsday declined her request and instead offered plaintiff the opportunity to apply for leave under the Family and Medical Leave Act ("FMLA"). (Id. at ¶¶ 75- 76). Alternatively, plaintiff was told she could work a split-shift, which would allow her to leave work mid-shift to attend physical therapy. (Id. at ¶ 75). Plaintiff refused the FMLA option surmising that the leave was unpaid and also rejected the split-shift option because it involved added travel back and forth to work. (Id. at ¶ 80; Pl. R. 56.1 Statement at 62; Ruhling Dep. at 132). In April 2005, plaintiff provided

Newsday with documentation from her physician indicating that she should limit her use of the computer keyboard and mouse to a maximum of four hours per day. (Def. R. 56.1 Statement at ¶ 81). Newsday permitted her to reduce her computer work accordingly. (Id.).

On January 27, 2003, following an anti-harassment training session, the plaintiff sent Newsdays' then-CEO, John Madigan, a memo indicating that pursuant to this training she felt compelled to disclose information which she believed was the "honorable thing to do" and which "reflect[ed] upon the image of corporate headquarters." (Defs. 56.1 Statement at ¶¶ 54, 56; Ruhling Dep. Ex. 32). In response to that memo, the plaintiff was contacted by telephone on February 4, 2003 by Katie Lawler, then-Vice President of Human Resources for Tribune Publishing, who explained that the plaintiff's concerns had been referred to Lawler for investigation. (Defs. 56.1 Statement at ¶¶ 58-59). Ruhling refused to discuss her complaint with Lawler insisting instead that she speak with the company CEO. (Id. at ¶ 62). Although plaintiff was informed that she must first provide Lawler the specifics of her complaint before a decision would be made on her request to speak with the CEO, she steadfastly refused to discuss the matter with Lawler. (Id. at ¶¶ 62, 65; Ruhling Dep. at 335-36, 342-51). According to the plaintiff, she did not discuss her complaint with Lawler because she was concerned that she would be subject to further retaliation and harassment. (Pl. R. 56.1 Statement at ¶ 51). Lawler contacted the plaintiff again on April 9, 2003. (Def. R. 56.1 Statement at ¶ 62). Plaintiff persisted in her demand that she speak directly with Newsdays' CEO, not Lawler. (Id.).

D.      Plaintiff's Suspensions and Subsequent Resignation

Apparently, not unlike other Newsday employees, plaintiff maintained a personal cell phone while at work. (Pl. R. 56.1 Statement at ¶ 65). According to Millrod, plaintiff's cell

phone was particularly disruptive to her co-employees and he instructed her to silence it at work. (Def. 56.1 Statement at ¶¶ 83-86). On February 5, 2003, when plaintiff did not comply, Millrod formally reprimanded her and suspended her for one day without pay for insubordination. (Id. at ¶ 87). Plaintiff objected to the suspension both because she was singled out for disciplinary action and because she claims to have complied with Millrod's direction which she believed was simply that she keep her cell phone on her person while at work. (Pl. R. 56.1 Statement at ¶ 69). Coincidentally, this suspension occurred the day after plaintiff's first conversation with Lawler.

On April 29, 2003 plaintiff was suspended for a second time without pay for taking a personal day off without prior approval from her supervisor. (Def. R. 56.1 Statement at ¶ 90). According to plaintiff, during her nearly twenty-year tenure at Newsday, she had never been required to obtain supervisory approval prior to taking a personal day. (Pl. R. 56.1 Statement at ¶ 70). This second suspension took place twenty days after plaintiff's second conversation with Lawler. (Def. R. 56.1 Statement at ¶ 62).

In January 2005, Debby Krenek became the Managing Editor in charge of the News Desks at Newsday. (Id. at ¶ 100). Shortly thereafter, Krenek met with the plaintiff to discuss plaintiff's interest in again working at the news desk. (Id. at ¶ 101). In April 2005, an opening became available in the newsroom on the Fold Desk. (Id. at ¶ 104). Given plaintiff's expressed interest in returning to the news desk, Kreneck transferred plaintiff to the Fold Desk effective May 9, 2005. (Id. at ¶ 105). The Fold Desk position required that plaintiff report to work one hour earlier than her current work schedule. (Id. at ¶ 108). Plaintiff asked that she not be transferred to this position because she could not report to work by 11:00 a.m. given her personal responsibilities. (Id. at ¶ 109). Krenek refused to rescind the transfer. (Id.). On May 9, 2005,

the day plaintiff was scheduled to begin work on the Fold Desk, she resigned from Newsday.  (Id. at ¶ 111).

On September 25, 2003, plaintiff filed a complaint with the New York State Division of Human Rights, which was also filed with the Equal Employment Opportunity Commission.  (Id. at 97).  The EEOC issue plaintiff a Notice of Right to Sue dated April 19, 2004.  (Id. at 98). Plaintiff filed the instant complaint on June 14, 2004 and, on June 6, 2006, amended her complaint to include a claim for retaliation as a result of her alleged constructive discharge on May 9, 2005.

II.     DISCUSSION

A.     Summary Judgment Standards

"'Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law.'" Jamaica Ash & Rubbish Removal Co. v. Ferguson, 85 F. Supp. 2d 174, 180 (E.D.N.Y. 2000) (quoting In re Blackwood Assocs., L.P. 153 F.3d 61, 67 (2d Cir. 1998) and citing Fed. R. Civ. P. 56(c) and Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).  In deciding a summary judgment motion, the district court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the opposing party.  See Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc., 150 F.3d 132, 137 (2d Cir. 1998).   If there is evidence in the record as to any material fact from which an inference could be drawn in favor of the non-movant, summary judgment is unavailable.  See Holt v. KMI-Continental, Inc., 95 F.3d 123, 129 (2d Cir. 1996).  The applicable substantive law determines which facts are critical and which are irrelevant.  See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).

The trial court's responsibility is "'limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution.'" B.F. Goodrich v. Betkoski, 99 F.3d 505, 522 (2d Cir. 1996) (quoting Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1224 (2d Cir. 1994)). When, however, there is nothing more than a "metaphysical doubt as to the material facts," summary judgment is proper. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "Rather, there must exist 'specific facts showing that there is a genuine issue for trial' in order to deny summary judgment as to a particular claim." Jamaica Ash & Rubbish, 85 F. Supp. 2d at 180 (quoting Celotex, 477 U.S. at 322). A moving party may obtain summary judgment by demonstrating that little or no evidence may be found in support of the non-moving party's case. "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Marks v. New York Univ., 61 F. Supp. 2d 81, 88 (S.D.N.Y. 1999).

"[T]he summary judgment standard applies with equal force to discrimination cases as it does to other cases." Faruq v. Wal-Mart Stores, Inc., 2006 U.S. Dist. LEXIS 4676, *12 W.D.N.Y. Jan. 23, 2006). "The salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to commercial or other areas of litigation." Ashton v. Pall Corp., 32 F. Supp. 2d 82, 87 (E.D.N.Y. 1999) (quoting Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985) (additional quotation marks omitted)). Thus, "[t]hough caution must be exercised in granting summary judgment where motive is genuinely in issue . . . [it] remains available for the dismissal of discrimination claims in cases lacking

genuine issues of material fact." McLee v. Chrysler Corp., 109 F.3d 130, 135 (2d Cir. 1997) (internal citations omitted). With these standards in mind, the court addresses the plaintiff's claims.

B.     Liability of Defendant Tribune Company

As a threshold matter, the court addresses the defendants' argument that there is no basis for imposing liability on the Tribune Company as the parent company of the plaintiff's employer, Newsday, Inc. In support of this argument, the defendants have provided the declaration of Mary Ann Skinner, Newsday's Assistant Managing Editor for Editorial Administration, stating that Newsday's daily "operations and management are not interrelated with or controlled by Tribune" nor does the Tribune "participate in the day-to-day management of Newsday's business affairs, operations or employees." (Skinner Decl. at ¶ 5). Further, she states that the "Tribune does not make personnel decisions regarding Newsday's employees . . . [and] did not make any decisions with regard to plaintiff Nancy Ruhling's employment at Newsday." (Id. at ¶¶ 5-6). In response, the plaintiff asserts that the "single employer doctrine" applies in this case because there is "'sufficient indicia of an interrelationship between the immediate corporate employer [Newsday] and the affiliated corporation [Tribune]'." (Plaintiff's Mem. at 13) (quoting Schade v. Coty, Inc., No. 00 Civ. 1568 (JGK), 2001 WL 709258, at *6 (S.D.N.Y. June 25, 2001)). For the reasons that follow, the undisputed facts do not support a finding that the Tribune and Newsday are a single employer. Accordingly, the claims against the Tribune Company are dismissed.

The Second Circuit has made clear that "the law only treats the employees of a corporate entity as the employees of a related entity under extraordinary circumstances." Murray v. Miner, 74 F.3d 402, 404 (2d Cir. 1996). In determining whether such circumstances are present, courts

apply a flexible, four-part test that examines whether the related entities have: "(1) interrelated operations, (2) common management; (3) centralized control of labor relations, and (4) common ownership."  Id.; Schade, 2001 WL 709258, at *6.  Satisfaction of all four factors is not required, nor is any one factor determinative.  Murray, 74 F.3d at 404.  Rather, "'[t]he critical question is what entity made the final decisions regarding employment matters related to the person claiming discrimination.'"  Id. at 405, quoting U.S. v. West, Inc., 3 F.3d 1357, 1362 (10th Cir. 1993).

In determining whether there is a "sufficient interrelation of operation" between the related entities, courts have considered factors such as "whether the parent was involved directly in the subsidiary's daily business decisions; whether the two entities shared employees, services, records, or equipment; and whether the entities commingled assets or finances . . . ."  Ennis v. TYCO, Int'l Ltd., No. Civ 02-9070 (TPG), 2004 WL 548796, at *4 (S.D.N.Y. March 18, 2004) (citations omitted); see also Schade, 2001 WL 709258, at *7.  In addition, the requisite degree of control over labor relations has been established when the parent reviewed applications for employment at the subsidiary, approved personnel status reports, and approved all major employment decisions for the subsidiary.  See, e.g., Cook v. Arrowsmith Shelburne, Inc., 69 F.3d 1235 (2d Cir. 1995).  The remaining factors, the degrees of common management and common ownership, "are considered less important, owing to the fact that 'they represent ordinary aspects of the parent-subsidiary relationship.'"  Ennis, 2004 WL 548796, at *5 (quoting Meng v. Ipanema Shoe Corp., 73 F. Supp.2d 392, 403 (S.D.N.Y. 1999).  With these standards in mind the court considers the evidence in this case.

Here, the plaintiff relies on the following undisputed facts in support of her contention that the Tribune and Newsday should be treated as a single employer: (1) the Tribune's Senior

Counsel advised Newsday to stop accepting plaintiff's freelance articles for publication in May 2002; (2) Newsday employees including the plaintiff were shown a videotape featuring the Tribune's then-CEO John Madigan as part of its harassment prevention training in January 2003 wherein he advised employees with concerns relating to harassment to contact, among others, the Vice President of Human Resources at the Tribune's corporate office; (3) Newsday also distributed materials at the January 2003 training indicating that concerns over the anti-harassment policy could be brought to the attention of the Tribune's Corporate Human Resources; (4) when plaintiff sought to impart information concerning the harassment policy that she believed "reflected upon the image of corporate headquarters", the Tribune's Vice President of Human Resources responded and explained that Ruhling's concerns had been referred to her for investigation. These facts, however, do not indicate the level of day to day control over employment matters required by the single employment doctrine. There is simply no evidence that the Tribune made the final decisions regarding employment matters as they related to plaintiff. Thus, in the absence of evidence of the interrelation of operations or centralized control over labor relations between the Tribune and Newsday, there is no basis to find that they are a single employer. Accordingly, the claims against the Tribune are dismissed.

C.      Ruhling's Claims of Age and Gender Discrimination

Ruhling claims that she was discriminated against on the basis of her age in violation of the Age Discrimination in Employment Act of 1967 ("the ADEA"), 29 U.S.C. §§ 631 et seq. and gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000-e, et seq. Her claims of age and gender discrimination are also brought pursuant to the New York State Human Rights Law (the "NYSHRL"), N.Y. Executive Law § 296 (McKinney's 2005).

Title VII prohibits an employer from discriminating against an individual "with respect to [her] compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1). The ADEA, which protects individuals over age forty from employment discrimination on account of their age, provides that it is "unlawful for an employer ... to ... discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1); McCarthy v. New York City Technical College of the City of New York, 202 F.3d 161, 165 (2d Cir. 2000). Similarly, the NYSHRL prohibits discrimination against an employee in the "terms, conditions or privileges of employment" because of the individual's sex and age. N.Y. Exec. Law § 296(a) (McKinney's 2005).

To establish a prima facie case of gender or age discrimination, Ruhling must demonstrate that: (1) she is a member of a protected group; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the circumstances surrounding the action permit an inference of discrimination. See Terry v. Ashcroft,336 F.3d 128, 137-38 (2d Cir. 2003); see also Woodman v. WWOR-TV, Inc., 411 F.3d 69, 76 (2d Cir. 2005) (recognizing that framework established by McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973) for Title VII claims of discrimination also applies to ADEA claims); Williams v. R.H. Donnelley, Corp., 368 F.3d 123, 126 (2d Cir. 2004) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)); Lightfoot v. Union Carbide, 110 F.3d 898, 913 (2d Cir.1997) (elements of an age discrimination claim "are essentially the same under the ADEA and the NYSHRL"); David v. Comtech PST Corp., No. 03 CV 6480(JO), 2006 WL 2713936, at * 7 (E.D.N.Y. Sept. 22, 2006) ("The New York Human Rights Law affords similar protection as

both Title VII and the ADEA, and is governed by the same legal standards as claims brought pursuant its federal law counterparts."). Although the burden of proving the prima facie case is de minimus, the claim fails if the plaintiff cannot make out a prima facie case of discrimination. Woodman, 411 F.3d at 76.

Once the plaintiff has established the prima facie case, the burden of proof then shifts to the defendant to offer a non-discriminatory reason for the employment action at issue. See Terry, 336 F.3d at 138, citing McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973). Once this non-discriminatory reason is established, the presumption of discrimination arising with the establishment of the prima facie case drops from the matter. See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 510-11 (1993). Thereafter, "to defeat summary judgment . . . the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." Terry, 336 F.3d at 138, citing Stern v. Trustees of Columbia Univ., 131 F.3d 305, 312 (2d. Cir. 1997).

This final burden of showing pretext may be satisfied either by the introduction of additional evidence or by reliance on the evidence submitted in support of the prima facie case of discrimination. See Reeves v. Sanderson Plumbing Prods. Inc., 530 U.S. 133, 148 (2000). The court must examine the entire record to determine whether the plaintiff "could satisfy the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff." Schnabel v. Abramson, 232 F.3d 83, 90-91 (2d Cir. 2000), citing Reeves, 530 U.S. at 143. Guided by these standards, the court now turns to the substance of the plaintiff's claims.

I.      Plaintiff's <u>Prima</u> <u>Facie</u> Case of Age and Gender Discrimination

The parties agree that Ruhling is a member of a protected class and that she was qualified for her job.  Therefore, the court's analysis begins with the adverse employment action requirement.  In this regard, the plaintiff claims that she suffered the following adverse employment actions:  (1) her transfer from the News Desk to the Features Desk in March 2002; (2) her February 2003 one-day suspension resulting from use of her cell phone; (3) her one-day suspension in April 2003 for taking a  personal day off; (4) the ban on the publication of her freelance work in May 2002; (5) the change of her work schedule in December 2002; (6) the excessive monitoring of her daily activities; (7) the denial of advancement opportunities; (8) the January 2003 reprimand, and (9) her transfer to the Fold Desk in April 2005.

The defendants acknowledge that the first three actions alleged by the plaintiff, namely, her transfer from the News Desk to the Features Desk in March 2002, her February 2003 one-day suspension for her refusal to silence her cell phone, and her one-day suspension in April 2003 for taking an unauthorized personal day off, are adverse employment actions.  However, with regard to the plaintiff's transfer from the News Desk to the Features Desk in March 2002, the defendants argue that this claim is untimely because it accrued more than 300 days before she filed an administrative charge of discrimination.  Plaintiff does not dispute that this claim would ordinarily be untimely, however, she urges that the continuing violations theory may be applied to save this claim.  The court disagrees.[2]

Under Title VII and the ADEA, a plaintiff must file an administrative charge with the

---

[2] As discussed <u>infra</u>, the plaintiff may, however, rely on this transfer in establishing her hostile work environment claim.

Equal Employment Opportunity Commission ("EEOC") within 300 days after a claim accrues. Quinn v. Green Tree Credit Corp., 159 F.3d 759, 765 (2d Cir. 1998). "This [300-day] requirement functions as a statute of limitations, in that discriminatory incidents not timely charged before the EEOC will be time-barred upon the plaintiff's suit in district court." Id. at 763. Here, the plaintiff dual filed her charge of discrimination with the State Division of Human Rights and the EEOC on September 25, 2003. Thus, the March 2002 transfer occurred outside the 300-day period and is untimely.

While the continuing violations doctrine may extend the limitations period for claims of discriminatory acts committed under an ongoing policy of discrimination, it is limited in application and does not preserve untimely claims related to "discrete, completed employment actions such as transfers, . . . ." Sundram v. Brookhaven National Laboratories, 424 F. Supp.2d 545, 560 (E.D.N.Y. 2006) (citing Griffin v. New York City Off-Track Betting Corp., 2002 WL 252758, at *2 (S.D.N.Y. Feb. 20, 2002)) (citing Lightfoot v. Union Carbide Corp., 110 F.3d 898, 907 (2d Cir. 1992) (add'l citations omitted). The Supreme Court has explained that, notwithstanding the continuing violations doctrine, because a discrete discriminatory act occurs on the day that it happened, a party must file her charge within 300 days of the act or lose the ability to recover for it. National Railroad Passenger Corp. v. Morgan, 536 U.S. 101,113-14, 122 S. Ct. 2061, 2072-73 (2002) (reversing application of the continuing violations doctrine to what the Ninth Circuit Court of Appeals termed 'serial violations' because "discrete discriminatory acts are not actionable if time-barred even when they are related to act alleged in timely filed charges."). Accordingly, the plaintiff's discrimination claim to the extent it is based on her March 2002 transfer is untimely.

Given the defendants' acknowledgment that the plaintiff suffered at least two timely adverse employment actions (namely her suspensions in February and April 2003) there is no dispute that adverse employment action requirement of the plaintiff's prima facie case is satisfied.[3]  The court must next consider whether the circumstances surrounding these actions permit an inference of age or gender discrimination.

a)  Claim of Age Discrimination:

The gravamen of the plaintiff's complaint is essentially that in January 2002 Newsday, as part of a cost-cutting effort and in an effort to reduce staff, offered the plaintiff and other senior employees a buyout.  Plaintiff asserts that following her decision not to take the buyout, Newsday targeted her for removal by subjecting her to a campaign of harassment intended to drive her out the door.  Thus, within days of her decision not to take early retirement, she was transferred from the news desk to a less prestigious assignment on the Features Desk.  While the transfer itself is not actionable because it is untimely, its temporal proximity to the plaintiff's decision not to take early retirement would permit a reasonable fact finder to conclude that Newsday was embarking on a course of conduct aimed at ridding itself of an older employee.  The record also indicates that following plaintiff's refusal to take the buyout she was subjected to reprimand, multiple suspensions, unwelcome transfers and schedule changes all of which plaintiff claims occurred because of her refusal to take early retirement.  Against these facts, the court finds that the plaintiff has set forth sufficient facts to sustain her minimal burden of stating a prima facie case of age discrimination.  Abrahamson v. Board of Educ. of the Wappingers Falls Central School

---

[3] The court therefore finds it unnecessary at this time to address the question whether the remaining employment actions asserted by plaintiff constitute adverse employment actions within the meaning of the law.

District, 374 F.3d 66,72 (2d Cir. 2004).

II.  The Defendants' Reasons For Their Actions

Having established a _prima facie_ case of age discrimination, the burden shifts to the defendants to establish legitimate, nondiscriminatory reasons for the alleged adverse employment actions.  That burden is satisfied.  With regard to her transfers (and related changes in her work schedule), the defendants have articulated that the decisions to transfer the plaintiff were made to better suit her skills, work performance and expressed assignment preference.  Similarly, the defendants state that the suspensions were imposed because the plaintiff was insubordinate and failed to follow Newsday's policies and procedures.

"Any legitimate, non-discriminatory reason will rebut the presumption triggered by the prima facie case.  Thus, 'the defendant need not persuade the court that it was actually motivated by the proffered reasons" in order to nullify the presumption and obligate the plaintiff to satisfy the burden.  If the defendant articulates a non-discriminatory reason, 'the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity.'" Fisher v. Vassar College, 114 F.3d 1332, 1335 (2d Cir. 1997) (internal citations omitted).  The evidence submitted by the defendants concerning each of the actions at issue establish for the purposes of this motion, a legitimate, non-discriminatory reason the actions taken.  Thus, the burden shifts back to the plaintiff to show that the reasons articulated were a pretext for age discrimination.

III.  The Plaintiff's Evidence of Pretext

To satisfy her burden of showing that the reasons articulated by the defendants were a pretext for age discrimination, the plaintiff need not come forward with evidence in addition to

that presented in support of her <u>prima facie</u> case. Instead, she may rely on her <u>prima facie</u> case 'combined with sufficient evidence to find that the employer's asserted justification is false." <u>See Reeves</u>, 530 U.S. at 148. As permitted by <u>Reeves</u>, the plaintiff relies primarily on the same evidence in support of her <u>prima facie</u> case.

The ultimate question for the court is whether, upon examination of the entire record, the plaintiff "could satisfy the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff." <u>Schnabel</u>, 232 F.3d at 90-91, quoting <u>Reeves</u>, 530 U.S. at 148. Here, there are issues of fact regarding the reasons for the defendants' actions, and based on those facts, the plaintiff may be able to persuade a jury that the defendants discriminated against her. For example, with regard to the conduct giving rise to the suspensions in 2003, the fact that the plaintiff appears never before to have been punished for that same conduct prior to refusing the buyout evidences that the defendants' proffered reasons may be pretextual. Similarly, at the same time that the plaintiff was transferred from the Night News Desk to the Features Desk other Assistant Editors were being transferred from the Features Desk to the Night News Desk. Defendants do not explain why it was necessary to move the plaintiff at that time. Nor do the defendants explain their decision to transfer plaintiff just two days after she declined the buyout. Moreover, although defendants claim to have been making assignments based upon plaintiff's expressed preferences, the record suggests otherwise. Indeed, as alleged by plaintiff she did not welcome the transfer to the Features Desk and objected to changes made to her schedule in December 2002 as well as her transfer to the Fold Desk in January 2005. Newsday's insistence on these changes apparently led to plaintiff's resignation. Thus, the court finds that the plaintiff has met her burden to show that the explanation offered by the defendants

may have been a pretext for age discrimination. Accordingly, the defendants' motion for summary judgment on the plaintiff's age discrimination claims is denied.

b) Claims of Gender Discrimination:

In contrast to the plaintiff's claim of age discrimination, the court finds that she has failed to present any evidence giving rise to an inference of gender discrimination. The only allegation that even remotely refers to gender occurred in December 2002, when Millrod changed plaintiff's schedule over that of a male colleague. As an initial matter it should be noted that a schedule change standing alone does not constitute an adverse employment action. Harris v. City of New York, No. 03 CV 1593 (DLI), 2006 WL 2034446, at *4 (E.D.N.Y. July 17, 2006) (no adverse employment action based on denial of shift change request absent any evidence that the denial led to a materially adverse change to the terms and conditions of plaintiff's employment ); Rivera v. Potter, No. 03CV 1991(LAP), 2005 WL 236490, at *5 (S.D.N.Y. Jan. 31, 2005) (unwanted schedule change not an adverse employment action ); Bright v. LeMoyne College, 306 F. Supp.2d 244, 253 (N.D.N.Y. 2004) ("That plaintiff expressed a preference for one shift is insufficient to conclude that her transfer was an adverse employment action." ); DeMars v. O'Flynn, 287 F. Supp.2d 230, 245-46 (W.D.N.Y. 2003) ("[P]lacement of plaintiff on the day shift versus the night shift [did not] constitute [] an adverse employment action."); see also Ifill v. United Parcel Service, No. 04 CV 5963 (LTS), 2005 WL 736151, at * (S.D.N.Y. March 29, 2005) ("[A] lateral transfer, even if imposed on an employee involuntarily, does not constitute an adverse employment action unless it is accompanied by some other material adverse change in conditions, such as a reduction in pay or status."). More importantly, plaintiff's own testimony concerning this event reveals that Millrod's decision was based not on gender but on his practice

of rewarding loyalty.  (Ruhling Dep. at 263-64, 275-279).  Plaintiff does not dispute that the decision to change her schedule was based on Millrod's desire to reward persons who joined the co-ed softball team.  Indeed, she acknowledged that female employees also may have benefitted from Millrod's practice of rewarding loyalty.  (Id. at 278-80, 284; Plaintiff's Mem. at 4; Pl's R. 56.1 Statement at ¶ 31).  Finally, plaintiff concedes that when she complained about her transfer she did not assert that it was based on gender discrimination.  (Ruhling Dep. at 279-80).  Plaintiff's own assessment that this employment decision was made based on loyalty, not gender, is fatal to her gender discrimination claim.  Scaria v. Rubin, No. 94 Civ. 3333(AJP), 1996 WL 389250, at *11 (S.D.N.Y. July 11, 1996) ("'favoritism' based on proven performance is surely a valid reason for promotion, and one that is used every day"), aff'd, 117 F.3d 652 (2d Cir. 1997); Rivera v. Nat'l Westminster Bank, 801 F. Supp. 1123, 1133 n. 13 (S.D.N.Y. 1992).

The law is clear that a plaintiff must present more than "mere speculation and conjecture" to defeat summary judgment.  Heneghan v. New York City Admin. for Children's Services, No. CV 03-2992 (BMC), 2006 WL 2620430, *3 (E.D.N.Y. Sept. 12, 2006) (citing Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986)   Because liability depends upon whether the plaintiff's gender actually motivated the defendants' decision, there simply can be no liability where there is a paucity of evidence that the plaintiff's gender "actually played a role in [the employer's decisionmaking] process and had a determinative influence on the outcome." Reeves, 530 U.S. at 141.  Given the total lack of evidence of gender discrimination, these claims are dismissed.  See Fed. R. Civ. P. 56(e).

D.      Ruhling's Claims of Disability Discrimination

Plaintiff  alleges that the defendants discriminated against her on account of her

disability, namely repetitive stress injury ("RSI") and failed to reasonably accommodate that disability. The ADA and the NYSHRL prohibit discrimination against persons with disabilities in the terms, conditions and privileges of employment. 42 U.S.C. § 12112(a); N.Y. Exec. Law § 296(a) (McKinney's 2005). The court first addresses her claims of disability discrimination.

1.      Disability Discrimination

The plaintiff's disability discrimination claim is subject to the <u>McDonnell Douglas</u> burden shifting framework. Under the ADA, a <u>prima facie</u> case of disability discrimination requires that the plaintiff show that: (1) the defendants are subject to the ADA; (2) the plaintiff has a disability within the meaning of the ADA; (3) the plaintiff was otherwise qualified to perform the essential functions of her job with or without reasonable accommodation; and (4) the plaintiff suffered an adverse employment action as a result of her disability. <u>Capobianco v. City of New York</u>, 422 F.3d 47, 56 (2d Cir. 2005). Here, the defendants do not dispute that they are subject to the ADA or that the plaintiff was qualified to perform the essential functions of her job. Rather, they claim that plaintiff is not disabled as a matter of law. They further assert that she has suffered no adverse employment action as a result of her alleged RSI.

To establish a disability within the meaning of the ADA, the plaintiff must establish either that (1) she suffers from a physical or mental impairment that "substantially limits" one or more "major life activities"; (2) "has a record of such impairment"; or (3) "is regarded as" having such an impairment. 42 U.S.C. § 12102(2); <u>Labella v. New York City Admin. For Children's Services</u>, 2005 WL 2077192, at *10 (E.D.N.Y March 28, 2005). "Irrespective of whether a plaintiff's claim is based on actual, recorded or perceived disability, the disability must be an impairment covered by the ADA, that is, the disability is one that substantially limits a major life

activity." Labella, 2005 WL 2077192 at *10, citing Colwell v. Suffolk County Police Dep't, 158 F.3d 635, 645-46 (2d Cir. 1998).

Defendants contend that the plaintiff has not supported her claim that her RSI substantially limits a major life activity. In this regard, the plaintiff contends that she has sufficiently established that she is disabled because her "ability to walk, sit, sleep, garden, turn her neck, drive, and keyboard are all substantially limited by her RSI." (Pl. Mem. at 29). Plaintiff also claims that her RSI substantially limits the major life activity of working. (Pl. Mem. at 5).

In Toyota Motors Mfg., Kentucky, Inc., v. Williams, 534 U.S. 148 (2002), cited by both parties, the Supreme Court clarified that "to be substantially limited in performing manual tasks, an individual must have a impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives. The impairment's impact must also be permanent or long term." Id. at 198. The Supreme Court explained that because there are "large potential differences in the severity and duration of the effects of carpal tunnel syndrome, an individual's carpal tunnel syndrome diagnosis, on its own, does not indicate whether the individual has a disability within the meaning of the ADA." Id. at 199. Thus, the Court considered whether the plaintiff's medical impairments, that caused her "to avoid sweeping, quit dancing, to occasionally seek help dressing, and to reduce how often she plays with her children, gardens, and drives long distances, established a manual task disability as a matter of law. Id. at 202. Concluding that they did not, the Court found that "these changes in her life did not amount to such severe restrictions in the activities that are of central importance to most people's daily lives." Id. Similarly, courts in this Circuit that have examined this issue

and found that by and large carpal tunnel syndrome or similar limitations on repetitive motion do not substantially limit a major life activity. See Matya v. Dexter Corp., No. 97 CV 763(JTC), 2006 WL 931870 (W.D.N.Y. April 11, 2006) (noting that difficulty sleeping is a common problem and that plaintiff's claim that this condition resulted from his carpal tunnel syndrome was insufficient to show a substantial limitation in this major life activity); Mikell v. Waldbaum, Inc., No. 02 Civ. 1501 (LBS), 2003 WL 21018844 (S.D.N.Y. May 5, 2003) (dismissing ADA claim despite plaintiff's claim that her carpal tunnel syndrome and bursitis significantly restricted her ability to work, perform household chores, walk, or get dressed); Balonze v. Town Fair Tire Centers, Inc., No. 02Cv 2247(WWE), 2005 WL 752198 (March 31, 2005) (finding plaintiff was not disabled under the ADA despite the fact that her RSI caused her to have difficulty braiding her hair, opening jars, folding clothes and lifting laundry and groceries); Serrano v. Terence Cardinal Cooke Health Care Center, No. 99 CV 5998, 2002 WL 31027183 (E.D.N.Y. Sept. 9, 2002) (plaintiff not disabled under the ADA because there was no evidence that her carpal tunnel syndrome substantially limited her ability to work); Cutler v. Hamden Board of Educ., 150 F. Supp.2d 356 (D. Conn. 2001) (citing more than fifteen cases granting summary judgment where plaintiff alleged an impairment of carpal tunnel syndrome but failed to demonstrate that she was substantially limited in a major life activity).

Applying these standards, the record does not support plaintiff's claim that her impairment substantially limited any major life activity. Plaintiff's own account of her injury indicates that, when her RSI is "at its worst" she "can't sleep on that side", has "difficulty carrying things" such as a briefcase or purse, and can't walk or sit in a chair for a long period of time because it becomes uncomfortable. (Ruhling Dep. at 149-150). She also conceded,

however, that she can walk "unlimited" distances on a daily basis and that she is able to groom herself, clean her house, drive her car and turn her neck although "that bothers me". (Id. at 150-152). Particularly compelling is the fact that despite her RSI she continued working without accommodation for two years until April, 2005 when she asked and was allowed to limit her keyboarding to four hours each day while otherwise performing full time work. Given the absence of any evidence that would indicate a substantial limitation of any major life activity, the facts fail to demonstrate that the plaintiff was disabled under the ADA.

2.      Perceived Disability

The plaintiff also claims that the defendants perceived her as disabled and discriminated against her based on that perception (Suppl. Compl. at ¶ 94). Under the third method of establishing a disability under the ADA, a plaintiff must show that she "is regarded as" having an impairment that substantially limits one or more major life activities. 42 U.S.C. § 12102(2)(c). "Whether an individual is 'regarded as' having a disability 'turns on the employer's perception of the employee' and is therefore 'a question of intent, not whether the employee has a disability.'" Labella, 2005 WL 2077192, at *15, quoting Francis v. Meriden, 129 F.3d 281, 284 (2d Cir. 1997). While "'the decisive issue is the employer's perception of his or her employee's alleged impairment," the plaintiff must show that the employer "'regarded her as disabled within the meaning of the ADA'." Labella, 2005 WL 2077192, at *15, quoting Colwell, 158 F.3d at 646, citing Francis, 129 F.3d 281, 285-86.

Apart from her allegation that she was "perceived by the Defendants and their agents as having a physical or mental impairment that substantially limits one or more of Ms. Ruhling's major life activities," (Suppl. Compl. at ¶ 94), the plaintiff has not addressed her perceived

disability discrimination claim in her papers and has provided no support for this claim. In fact, plaintiff's perceived disability claim is undermined by her statement that Liane Guenther (the supervisor that issued the January 2003 reprimand to Ruhling for failing to properly format quotation marks) "alluded to the fact that she thought I was faking my RSI and in conversations with me she claimed I was typing furiously away on my computer doing work that was not Newsday-related right after I said my arms were hurting." (Pl. errata sheet to her deposition referencing page 426, line 15, submitted as "Ex. C" to plaintiff's exhibits). Thus, plaintiff herself acknowledges that the defendants did not perceive her to be disabled within the meaning of the ADA. Because the plaintiff is not disabled for purposes of the ADA, her claims under this statute must be dismissed.

### 3. State Law Disability Discrimination Claim

While disability claims under the ADA and the NYSHRL are subject to the same analytical framework, the NYSHRL has a more expansive definition of "disability" and does not require a plaintiff to identify a major life activity that is substantially limited by the alleged impairment. Reeves v. Johnson Controls World Services, Inc.,140 F.3d 144, 154-55 (2d Cir. 1998); Jones v. Government Employees Insurance Co., Inc., No. 04-3492(WDW), 2006 WL 1229136, at *5 (E.D.N.Y. May 8, 2006) ("The definition of disability is broader under the HRL than it is under the ADA."); Matya, 2006 WL 931870 at *6 ("[U]nder state law, a disability need only be a demonstrable impairment; it does not have to substantially limit a major life function."). Here, the defendants do not dispute that the plaintiff is disabled under the NYSHRL. (Defs. Mem. at 28, n. 5). Accordingly, the court examines the plaintiff's state law claim of disability discrimination.

The dispute centers around the fourth requirement of the prima facie case, namely whether the plaintiff suffered an adverse employment action as a consequence of her disability. In this regard, the plaintiff broadly claims in her complaint that the same nine actions which gave rise to her age and gender discrimination claims also constituted adverse actions taken against her on account of her disability.

It is undisputed that despite the fact that the plaintiff advised the defendants that she was suffering from a recurrence of her RSI and could not perform certain tasks in December 2002 and January 2003, she was issued a reprimand for failing to complete such tasks. On the heels of this reprimand, in February and again in April 2003, plaintiff asserts she was singled out and suspended for conduct which, according to plaintiff, was long established acceptable conduct. Significantly, the reprimand and suspensions occurred after nearly eighteen years of plaintiff's continued employment without incident. As detailed supra, the defendants' have acknowledged that the February and April 2003 suspensions constitute adverse employment actions. A reasonable jury could find an inference of disability discrimination on this basis. The court finds, therefore, that the plaintiff has set forth sufficient facts to sustain her minimal burden of stating a prima facie case of disability discrimination under the NYSHRL.

Having established a prima facie case of disability discrimination, the burden shifts to the defendants to establish legitimate, nondiscriminatory reasons for the adverse employment actions. See Heyman, 198 F.3d at 72. That burden is satisfied. With regard to the suspensions and reprimands, as noted, the defendants state that the plaintiff was insubordinate and failed to follow Newsday's policies and procedures. Thus, the burden shifts back to the plaintiff to show that the reasons articulated were a pretext for disability discrimination.

To satisfy her burden of showing that the reasons articulated by the defendants were a pretext for disability discrimination, the plaintiff relies primarily on the same evidence in support of her prima facie case. There are plainly issues of fact regarding the reasons for the defendants' actions, and based on those facts, the plaintiff may be able to persuade a jury that the defendants discriminated against her on the basis of her disability. For example, a reasonable fact-finder could conclude that the temporal proximity of the 2003 suspensions to the recurrence of the RSI injury coupled with the fact that the plaintiff had never before been penalized for that same conduct evidences that the defendants' proffered reasons may be pretextual. A jury could infer discrimination based upon the fact that the plaintiff was reprimanded in 2003 for not performing tasks which were made difficult because of her RSI. Thus, plaintiff has satisfied her burden on the pretext requirement and the defendants' motion for summary judgment as to her state law disability discrimination claim is denied.

### 4. State Law Failure to Accommodate Claim

Plaintiff also alleges that the defendants' failure to reasonably accommodate her disability gives rise to a disability discrimination claim under the NYSHRL. The NYSHRL prohibits an employer from discriminating against a disabled employee in "terms, conditions or privileges of employment" and the failure to provide a reasonable accommodation is a form of discrimination under the statute. N.Y. Exec. Law §§ 296(a); 296 (3)(a) ("It shall be an unlawful discriminatory practice for an employer . . . to refuse to provide reasonable accommodations to the known disabilities of an employee . . . .").[4] A failure to accommodate claim requires a plaintiff to allege

---

[4]Implicit in the statute is the requirement that the accommodation enable the employee to continue to enjoy or perform the terms, conditions or privileges of employment. This court found no case in which a reasonable accommodation claim was asserted where, as here, the

facts showing that: (1) she has a disability; (2) with or without reasonable accommodation she was qualified to perform the essential functions of the job; (3)  the employer discriminated against her because of her disability.  Cameron v. Community Aid for Retarded Children, Inc., 335 F.3d 60, 63 (2d Cir. 2003); Powers v. Polygram Holding, Inc., 40 F. Supp.2d 195, 198 (S.D.N.Y. 1999).  A disability discrimination claim alleging a failure to accommodate under the New York State Human Rights Law is governed by the same legal standards as govern federal ADA claims.  Graves v. Finch Pruyn & Co., Inc., 457 F.3d 181, 184 n.3 (2d Cir. 2006).

Here, the dispute centers around the second element of the prima face case, whether the plaintiff, with a reasonable accommodation, was "qualified" to  perform the essential functions of her job duties.  There is no question that the plaintiff initially requested a facially reasonable accommodation in seeking either a change of her work days, or the ability to report to work an hour later twice a week for four weeks.  However, the NYSHRL envisions that an employer and a disabled employee will work together to find a satisfactory accommodation.  9 NYCRR § 466.11(j) and (k); Hayes v. Estee Lauder Co., Inc., 2006 WL 3444258, at * 1 (2d Dep't Nov. 28, 2006).  Ultimately, the choice as to which of several reasonable accommodations will be implemented is left to the sound discretion of the employer.  See 29 C.F.R. § 1630.9 ("The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the qualified individual with a disability . . . . . [T]he employer providing the accommodation has the ultimate discretion to choose between effective

---

record reflects that the employee, either with or without the accommodation, was able to continue working and was in no danger of having the terms, conditions or privileges of employment changed.

accommodations and may choose the less expensive accommodation or the accommodation that is easier for it to provide." ); Cormier v. City of Meriden, 420 F. Supp.2d 11 (D. Conn. 2006) ("The ADA does not necessarily entitle plaintiff to her preferred accommodation so long as the offered one does not create a significant burden on her."); Hoyt v. NYNEX Corp., No. 94 CV 218 (RSP), 1996 WL 550374, at *4 (N.D.N.Y. Sept. 25, 1996) ("an employer is not required to provide every accommodation the disabled employee requests, so long as the accommodation provided is reasonable.").

In response to the plaintiff's proposal and consistent with its statutory obligations, the defendants offered her two alternatives: (1) the opportunity to work a split-shift, which would allow her to leave work mid-shift to attend physical therapy, or (2) the opportunity to apply for short term leave under the Family and Medical Leave Act ("FMLA").[5] The court must examine whether the defendants' counterproposal satisfied their obligation to provide a reasonable accommodation. Here, the split-shift alternative offered by the defendants reasonably met the plaintiff's stated need - - time to attend physical therapy. (Ruhling Dep. at 101,107, 117, 119-20, 130, 133). The plaintiff claims that the split-shift option was unreasonable because at some unspecified time in the past, for some unspecified reason she had tried to work a split-shift and was told that she could not do so. (Pl. 56.1 Counterstatement at ¶ 60; Ruhling Dep. at 128-130, 138-39). This argument ignores the fact that unlike her prior experience, plaintiff was given specific written permission by her employer to work a split-shift. (Ruhling Dep. Exs. 11, 14). Plaintiff did not try the split-shift option after being given permission to do so and therefore had no idea whether it would present any difficulties. (Ruhling Dep. at 128). Plaintiff also argues

_____

[5]The record is unclear as to whether the defendants' proposal was for paid leave.

that the split-shift option was unreasonable because it would increase the amount of driving she

would have to do each day. (P. Mem. at 6; Ruhling Dep. at 130). This argument is simply

unavailing. The record indicates that plaintiff did not begin work until 12:30 p.m. each day. She

had ample time in the morning to seek treatment without any disruption to her work schedule.

Instead, plaintiff insisted that Newsday change her work schedule so as not to cut into her

personal time in the morning. Newsday acceded to this somewhat questionable demand by

offering her the split-shift option. Notwithstanding this accommodation, plaintiff nonetheless

considered the split-shift option inconvenient and rejected it. The fact that plaintiff may have

preferred her own proposal does not render the defendants' proposal unreasonable. The

defendants' proposal addressed each of plaintiff's stated demands i.e. that she be given time for

therapy and that she not be required to use her personal time for treatment. Having failed to

demonstrate that the defendants refused to provide her a reasonable accommodation, the

plaintiff's failure to accommodate claim is dismissed.[6]

     E.     Hostile Work Environment Claims

The plaintiff also asserts hostile work environment claims pursuant to Title VII, the

ADEA, the ADA and the NYSHRL based upon the cumulative effect of the defendants' actions.[7]

_____

[6] Given the finding that the split-shift proposal was reasonable, the court need not reach the question of whether the leave option was also reasonable. The court notes, however, that a short-term leave of finite duration may be a reasonable accommodation. Stamey v. NYP Holdings, Inc., 358 F. Supp.2d 317, 327 (S.D.N.Y. 2005) (concluding that while a short term leave of absence of finite duration is reasonable, a request for leave without a return date was unreasonable as a matter of law).

[7] As noted, this court has determined that plaintiff was not the victim of gender discrimination thereby eliminating gender as a basis for relief under either a claim of hostile working environment or constructive discharge. Additionally, given the court's conclusion that

A plaintiff establishes a hostile work environment claim by showing that "[t]he workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys. Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 370 (1993) (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65, 106 S. Ct. 2399, 2404 (1986)); see also Pennsylvania State Police v. Suders, 542 U.S. 129, 124 S.Ct. 2342 (2004); Quinn v. Green Tree Credit Corp., 159 F.3d 759, 765 (2d Cir. 1998) (2d Cir.1998); Tomka v. Seiler Corp., 66 F.3d 1295, 1305 (2d Cir. 1995). In assessing the overall hostility of a workplace, charges of discrimination must be "considered cumulatively in order to obtain a realistic view of the work environment." Schwapp v. Town of Avon, 118 F.3d 106, 110-11 (2d Cir. 1997). "The incidents comprising a hostile work environment need not make any reference to the trait or condition on the basis of which the discrimination has occurred, so long as the incidents can reasonably be interpreted as having taken place on the basis of that trait or condition." Svenningsen v. College of Staten Island, No. 01 CV. 7550(SJ), 2003 WL 21143076, at *2, citing Gregory v. Daly, 243 F.3d 687, 695 (2d Cir. 2001).

Hostile work environment claims brought under the ADEA and the NYSHRL are analyzed under the same standards. Brennan v. Metropolitan Opera Ass'n, Inc., 192 F.3d 310, 316-17 (2d Cir. 1999) ("Employment discrimination claims brought under the NYSHRL are analyzed identically to claims under the ADEA and Title VII."); Ferraro v. Kellwood Co., 440 F.3d 96, 99 (2d Cir. 2006) (same standards apply to disability discrimination claims brought

---

the plaintiff was not disabled under the ADA, there can be no liability on her federal disability discrimination claim on the theories of hostile working environment or constructive discharge.

under the NYSHRL and the ADA). A plaintiff who brings a hostile work environment claim must prove that: (1) she is a member of a protected class; (2) she suffered unwelcome harassment; (3) she was harassed because of her membership in a protected class; and (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment. Brennan, 192 F.3d at 318 (ADEA and Title VII claims); Ferraro, 440 F.3d at100 (NYSHRL claims); Scott v. Memorial Sloan-Kettering Cancer Center, 190 F. Supp.2d 599, 598-99 (S.D.N.Y. 2002) (ADA claim) (citations omitted). Although there is no "threshold magic number of harassing incidents that gives rise, without more, to liability," Howley v. Town of Stratford, 217 F.3d 141, 154 (2d Cir. 2000) (quoting Richardson v. New York Department of Correctional Services, 180 F.3d 426, 439 (2d Cir.1999)) (internal punctuation omitted), the plaintiff must demonstrate either that "a single incident was extraordinarily severe" or that "a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir.2000) (citations and internal quotation marks omitted). The Second Circuit has instructed that "the appalling conduct alleged in prior cases should not mark the boundary of what is actionable. Richardson, 180 F.3d at 439. Rather, "[t]he test is whether 'the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse.'" Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 70 92d Cir. 2000) (quoting Torres v. Pisano, 116 F.3d 625, 632 (2d Cir. 1997)).

As a threshold matter, the court addresses the issue of timeliness of these claims to the extent that the plaintiff relies on conduct occurring before November 29, 2002 (300 days before her September 25, 2003 complaint to the NYSDHR). "Hostile environment claims are different

in kind from discrete acts. Their very nature involves repeated conduct." National Railroad

Passenger Corp. v. Morgan, 536 U.S. 101, 117, 122 S. Ct. 2061, 2074 (2002). Because a hostile

work environment claim is composed of a series of separate acts that collectively constitute one

unlawful employment practice, a hostile work environment claim will be timely so long as "one

act contributing to claim occurred within the statutory period; if it did, 'the entire time period of

the hostile environment may be considered by a court for purposes of determining liability.'"

Sundram, 424 F. Supp.2d at 560 (quoting Patterson v. County of Oneida, 375 F.3d 206, 220 (2d

Cir. 2004) (quoting Morgan, 536 U.S. at 117, 122 S. Ct. at 2074). Thus, given that there are

several alleged acts contributing to her hostile work environment claims that occurred within the

statutory period, the court may  properly consider the entire time period of the alleged hostile

environment.

Plaintiff claims that the cumulative effect of the following acts created a hostile work

environment based on her age and disability: (1) her transfer from the News Desk to the Features

Desk in March 2002; (2) her February 2003 one-day suspension for her refusal to silence her cell

phone; (3) her one-day suspension in April 2003 for taking an unauthorized personal day off; (4)

the ban on the publication of her freelance work in May 2002; (5) the change of her work

schedule in December 2002; (6) the excessive monitoring of her daily activities; (7) the denial of

advancement opportunities; (8) the January 2003 reprimand, and (9) her transfer to the Fold Desk

in April 2005.

As noted, the defendants concede that plaintiff is a member of a protected class. The

parties dispute, however, the remaining elements of a prima face case of hostile work

environment. There are plainly issues of fact with respect to whether the workplace was

33

permeated with discriminatory intimidation severe enough to alter the conditions of the plaintiff's work environment. The defendants refute the facts relied upon by the plaintiff to prove her claim. The fact-finding required to accept the defendants' version of the events is not an exercise that may be carried out in the context of a motion for summary judgment.

The analysis does not end here, however, given the defendants' assertion that they have established the Faragher/Ellerth affirmative defense to the plaintiff's hostile work environment claims and therefore this claim should be dismissed. (Defs' Mem. at 22; see Faragher v. City of Boca Raton, 524 U.S. 775 (1998); Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998)). Defendants' argument, however, ignores clearly established law that the Faragher/Ellerth affirmative defense is unavailable where the actions complained of emanate from the employer through its supervisory personnel. Faragher, 524 U.S. at 807, 118 S. Ct. at 2293; Ellerth, 524 U.S. at 765, 118 S. Ct. at 2270; see also Pennsylvania State Police v.Suders, 542 U.S. 129, 124 S.Ct. 2342 (2004); Huaman v. American Airlines, Inc., No. 00 CV 6336 (FB), 2005 WL 2413189, *3 (E.D.N.Y. Sept. 29, 2005). Accordingly, for the reasons detailed above, the defendants' summary judgment motion on the plaintiff's age and state law disability based hostile work environment claims is denied.

F.      Constructive Discharge Claim

The plaintiff's next claim is for constructive discharge brought under the ADEA and the NYSHRL. Ruhling alleges that her May 2005 transfer to the Fold Desk was a constructive discharge. Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily. Terry v. Ashcroft, 336 F.3d 128, 151-52 (2d Cir. 2003), citing

Kirsch v. Fleet St., Ltd., 148 F.3d 149, 161 (2d Cir.1998); Chertkova v. Connecticut General Life Insurance Co., 92 F.3d 81, 89 (2d Cir. 1996). According to the Second Circuit, "working conditions are intolerable when, viewed as a whole, they are 'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" Terry, 336 F.3d at 152, quoting Chertkova, 92 F.3d at 89. A prima facie case of constructive discharge requires that the plaintiff establish that the alleged constructive discharge "occurred in circumstances giving rise to an inference of discrimination on the basis of [her] membership in [a protected] class." Terry, 336 F.3d at 152, quoting Chertkova, 92 F.3d at 91.

On this record, the court finds that the plaintiff has presented sufficient evidence to allow a reasonable fact-finder to conclude that a reasonable person in her position would have felt compelled to resign. First, as discussed previously, the plaintiff has made a sufficient showing for a reasonable trier-of-fact to find that she was experiencing a hostile work environment. See supra at 30-34. Second, the undisputed facts establish a series of adverse events following her declination of the early retirement incentive and the recurrence of her RSI injury including, changes to her work schedule and job assignment, reprimands and suspensions, all of which would permit a reasonable person to infer that she was not wanted as an employee because of her age and/or disability. This conclusion is further bolstered by the fact that although the plaintiff had consistently advised the defendants that she could not work in the mornings, her final assignment was to a position which required her to work mornings. See, e.g., Karn v. Williams Advanced Materials, No. 02 CV 852, 2006 WL 361973 (W.D.N.Y. Feb. 15, 2006) ("'A transfer of an employee to a job the employer knows or should know the employee cannot perform can constitute an adverse employment action'."), quoting Jackson v. Heidelberg, LLC 2005 WL

735961, *5 (W.D.N.Y. 2005). As Ruhling describes, the transfer to the Fold Desk was the "proverbial straw that broke the camel's back." (Pl. Mem. at 15). The plaintiff has put forth sufficient evidence to allow a trier-of-fact to conclude that the constructive discharge occurred under circumstances giving rise to an inference of age and/or disability discrimination. Plaintiff does not allege that just a single event caused her to be constructively discharged, but rather that her discharge resulted from the cumulative conduct of the defendants. (Pl. Mem. at 14). This is sufficient to state a valid claim for constructive discharge. Chertkova, 92 F.3d at 90 (recognizing that a constructive discharge claim can be premised on the cumulative affect of a number of adverse conditions in the workplace). Since Ruhling has put forth sufficient evidence for a trier-of-fact to conclude that a reasonable person would have felt compelled to leave her job, and that this resulted from an improper motive, summary judgment is inappropriate.

The defendants again assert the Faragher/Ellerth affirmative defense in connection with this claim. As previously explained, this defense is unavailable where the conduct complained of is employer sanctioned. See supra at 34. The Supreme Court has made clear that where an employee "quits in reasonable response to employer-sanctioned adverse action officially changing her employment status or situation" the affirmative defense is unavailable. Suders, 542 U.S. at 134, 124 S. Ct. at 2347. Since the plaintiff's constructive discharge claim is based on conduct of her employer, this affirmative defense is clearly unavailable. The defendants' motion as to the plaintiff's constructive discharge claims is therefore denied.

G.      Plaintiff's Retaliation Claims

The court next addresses the plaintiff's claims brought pursuant to the anti-retaliation provisions of the Title VII, the ADEA, the ADA and the NYSHRL. These statutes prohibit

retaliation against any employee who makes a complaint against her employer regarding any practice made unlawful by these statutes. See 42 U.S.C. § 2000e-3(a); 29 U.S.C. § 623(d); 42 U.S.C. § 12203(a); N.Y. Exec. Law § 296(e). These statutes contain similar provisions against retaliation and are governed by the same standards. Cifra v. General Electric Co., 252 F.3d 205, 216 (2d Cir. 2001) (Title VII); Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002) (ADA and NYSHRL); Devlin v. Transportation Communications Int'l Union, Nos. 95 Civ.742 (JFK), 95 Civ. 10838 (JFK), 2002 WL 413919, at *12 (ADEA and NYSHRL).

Here, the plaintiff alleges that the defendants engaged in a course of retaliation against her. More specifically, she alleges that, almost immediately after commencing her employment at Newsday in 1984, she was sexually harassed by her supervisor and reported that harassment to "the appropriate persons within the Defendants' chain of command shortly after the harassment commenced." (Suppl. Compl. at ¶¶ 17-18). According to the plaintiff, as a result of that report, she has been "continuously and systematically retaliated against in various ways by the defendants." (Id. at ¶ 19). Plaintiff also claims that, following her decision to decline the buyout, the defendants subjected her "to an ongoing barrage of . . . retaliatory actions . . . all as a result of [her] opting not to take the buyout." (Id. at ¶ 32). She further asserts that she suffered retaliation as a result of the internal complaints she made in December 2002 when she complained about Millrod's favoritism and in January 2003 when she contacted the then-CEO of Newsday, John Madigan, to discuss harassment in the workplace. (Id. at ¶¶ 61, 72, 74; Pl. R. 56.1 Statement at ¶¶ 29, 48; Ruhling Dep. Ex. 32). Finally, plaintiff asserts that she was retaliated against following the filing of her September 23, 2003 complaint to the NYSDHR and after commencing this lawsuit on June 14, 2004. (Suppl. Compl. at ¶¶ 58-59, 72, 76).

Claims of retaliation are analyzed using the McDonnell Douglas burden-shifting framework discussed above. See, e.g., Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002); Terry v. Ashcroft, 336 F.3d 128, 140-41 (2d Cir. 2003). Under that framework, a plaintiff has the initial burden of establishing a prima facie case of retaliation by showing: (1) that the plaintiff engaged in a protected activity; (2) that the employer was aware of this activity; (3) that the employer took an adverse action against the plaintiff; and (4) that a causal connection exists between the alleged adverse action and the protected activity. Treglia, 313 F.3d at 719. A plaintiff's burden at this prima facie stage is de minimis. Id. Once a plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged employment action. Id. If the defendant meets this burden, "'the plaintiff must point to evidence that would be sufficient to permit a rational fact-finder to conclude that the employer's explanation is merely a pretext for impermissible retaliation.'" Id., quoting Cifra v. General Electric Co., 252 F.3d 205, 216 (2d Cir. 2001). With these standards in mind, the court considers the plaintiff's retaliation claims.

As noted above, the first element of the plaintiff's prima facie case requires her to establish that she engaged in protected activity. An individual engages in "protected activity" under the ADA if he "has opposed any practice made unlawful by this section" or has "participated in any manner in an investigation, proceeding, or litigation under this chapter." 29 U.S.C. § 623(d). Interpreting this language, the Second Circuit has explained that, "[a]s this choice of language clearly indicates, Congress sought to protect a wide range of activity in addition to the filing of a formal complaint." Grant v. Hazelett Strip-Casting Corp., 880 F.2d 1564, 1569 (2d Cir. 1989); Brands-Kousaros v. Banco Di Napoli S.P.A., No. 97 Civ.

1673(DLC), 1997 WL 790748, at *5 (S.D.N.Y. Dec. 23, 1997), citing Kotcher v. Rosa &
Sullivan Appliance Ctr., Inc., 957 F.2d 59, 65 (2d Cir. 1992) ("While a protected activity
generally takes the form of filing a formal complaint of discrimination with an administrative
agency, or filing a lawsuit, it can also be found where a plaintiff makes an internal complaint of
discrimination." ). "[A] retaliation claim may in some instances be established even where there
has been no Title VII-prohibited discrimination, *i.e.*, where the plaintiff shows, inter alia, that she
had a good faith, reasonable belief that the conduct she opposed violated Title VII and that the
employer could reasonably have understood that Title VII-prohibited discrimination was the
subject of her protest." Galdieri-Ambrosini v. National Realty & Development Corp., 136 F.3d
276, 287 (2d Cir. 1998); see also Treglia, 313 F.3d at 719 (applying the same standard under the
ADA, explaining that a "plaintiff may prevail on a claim for retaliation even when the underlying
conduct complained of was not in fact unlawful 'so long as he can establish that he possessed a
good faith, reasonable belief that the underlying challenged actions of the employer violated [the]
law'."), quoting Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 159 (2d Cir.
1999) (internal quotation marks omitted)).

Applying these principles here, while the defendants concede that the complaint to the
NYSDHR and the instant complaint are statutorily protected activities, they contend that her
declination of the buyout and her internal complaints made on December 31, 2002 about Millrod
and on January 27, 2003 to Madigan were not. (Defs. Mem. at 16, n. 2).

As an initial matter, the court agrees that plaintiff's retaliation claim as based on her
declination of the buyout is without merit. The declination of a buyout is not protected activity

under the law and cannot serve as the basis of a retaliation claim.[8]  See, e.g., Cruz v. Coach Stores, Inc., 202 F.3d 560, 566 (2d Cir. 2000) (explaining that only an adverse action based on opposition to statutorily prohibited discrimination is actionable).  Similarly, this court is hard pressed to conclude that  plaintiff's internal complaint of "favoritism" was protected activity.  Plaintiff's own account of this event indicates that she did not frame this complaint as one involving discriminatory conduct.  Indeed, she concedes that prior to February, 2003 she had never complained to Newsday's management about unlawful discrimination.  (Ruhling Dep. at 319-21).  Rather as discussed above, her complaint about Millrod was simply that he favored persons, male or female, who were loyal to him.  See supra at 19-20.  Although Newsday undertook an investigation of this complaint, finding that it was unfounded, there is nothing in the record to support plaintiff's current assertion that this was protected activity.  Thus, to the extent that the plaintiff's retaliation claim is based on this internal complaint it is without merit.

The court reaches a different conclusion, however, with regard to the plaintiff's internal complaint to Madigan.  The record reveals that the plaintiff wrote to Madigan on January 27, 2003 and later spoke with Lawler in early February, 2003.  Her memo to Madigan references the fact that she had information she felt compelled to disclose pursuant to the anti-harassment training she had just received.  (Ruhling Dep. Ex. 32).  The unmistakable import of this memo was that plaintiff intended to complain about harassment in the workplace.  This was clearly protected activity.

Having found that the plaintiff  engaged in statutorily protected activity when she filed

---

[8]The court notes that the complaint also alleges that the defendants offered plaintiff an opportunity to participate in the 2002 buyout again in June 2003 which she declined.  (Suppl. Compl. at ¶ 52).  This claim is similarly dismissed.

her 2003 internal complaint and her complaint to the NYSDHR on September 25, 2003 as well as when she filed the instant suit in June 14, 2004, the court next addresses whether Newsday was aware of these complaints. There is simply no dispute that plaintiff's complaints were known to management. In this regard, plaintiff does not have to show that the individual supervisors who subjected her to the alleged adverse employment actions knew of her complaints. Cunningham v. Consolidated Edison, Inc., 2006 WL 842914, at * 16 (E.D.N.Y. March 28, 2006). Rather, it is enough to show that Newsday had a "general corporate knowledge." Id., citing Gordon v. New York City Board of Education, 232 F.3d 111, 116 (2d Cir. 2000).[9] Newsday can be said to have had "general corporate knowledge" of the plaintiff's complaints and she has therefore met her burden on this prong.

The court next considers whether the defendants took adverse action against the plaintiff. In this regard, the plaintiff asserts generally that, since her 1984 complaint of sexual harassment she has been "continuously and systematically retaliated against in various ways by the defendants."[10] The first action specifically alleged by the plaintiff to be retaliatory was her transfer from the Night News Desk to the Features Desk in March 2002. Plaintiff also cites her work schedule change in December 2002, the written reprimand she received on January 20, 2003, the suspensions she received on February 5, 2003 and April 29, 2003, as well as the transfer from the Features Desk to the Fold Desk in April 2005. The question of what conduct satisfies the

_____

[9] The court notes, however, that a "[l]ack of knowledge on the part of particular individual agents is admissible as some evidence of lack of causal connection, countering [a] plaintiff's circumstantial evidence of proximity or disparate treatment." Gordon, 232 F.3d at 117.

[10] The defendants fail to address whether this 1984 complaint constitutes protected activity which for purposes of this discussion, the court assumes it is.

adverse action requirement for a retaliation claim involves a different analysis from that applied to a substantive discrimination claim. In Burlington Northern & Santa Fe Railway Co., v. White, - U.S. -, 126 S. Ct. 2405 (2006), the Supreme Court held that a plaintiff asserting a retaliation claim need not show adverse conduct which affects the terms and conditions of employment. Rather, it is sufficient to show conduct which might have dissuaded a reasonable worker from making or supporting a charge of discrimination. Id. at 2412-13. In Kessler v. Westchester County Dept of Social Services, 461 F. 3d 199 (2d Cir. 2006) the Second Circuit, applying White, determined that a job reassignment may satisfy the adverse action requirement in a retaliation claim. Kessler, 461 F.3d at 209. Folded into the analysis of what constitutes an actionable adverse action is the requirement that there be a causal connection between the adverse action and the protected activity.

In evaluating whether a causal connection exists between the adverse action and the protected activity, courts have considered their temporal proximity. See, e.g., Cunningham, 2006 WL 842914, at * 19, citing Cifra, 252 F.3d at 216, quoting Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir. 1996); Davis v. State University of New York, 802 F.2d 638, 642 (2d Cir. 1986). The cases "uniformly hold that the temporal proximity must be 'very close.'" Cunningham, 2006 WL 842914, at *19, quoting Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273-74, (2001). While the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action" Gorman-Bakos v. Cornell Coop. Extension, 252 F.3d 545, 554-555, n. 5 (2d Cir. 2001) (collecting cases), district courts in this Circuit have consistently held that a passage of two

months between the protected activity and the adverse employment action seems to be the dividing line. Ashok v. Barnhart, 289 F. Supp.2d 305, 315 (E.D.N.Y 2003) ("a period of only two months between a protected activity and an adverse action may permit a reasonable jury to find the acts to be temporally proximate and causally related"); Hussein v. Hotel Employees & Restaurant Union, Local 6, 108 F. Supp.2d 360, 367 (S.D.N.Y. 2000) ("the passage of more than two months defeats any retaliatory nexus"); Ponticelli v. Zurich American Ins. Group, 16 F. Supp.2d 414, 436 (S.D.N.Y. 1998) ("causal connection" element of retaliation claim"not established where two-and-a-half months lapsed between complaint and adverse action).

Applying these standards, the court finds that with respect to plaintiff's 1984 complaint, her transfer in 2002 is simply too remote to support a finding of a causal connection. The plaintiff has not provided any evidence of adverse actions taken in the eighteen years between the 1984 complaint and the 2002 transfer and as such her claim of retaliation based on this protected activity is dismissed.

The court, however, finds a compelling casual connection between the 2003 internal complaint and the plaintiff's suspensions which requires denial of defendants' motion for summary judgment in this respect. In short, a reasonable juror could find that plaintiff's suspension the day after her first conversation with Lawler and her suspension within three weeks of her second conversation with Lawler were intended to retaliate against plaintiff and dissuade her from pursuing her complaint.

Finally, although the plaintiff was clearly engaged in protected activity when she filed a complaint with the NYSDHR in September 2003 and this lawsuit in June 2004, the only adverse action alleged following these complaints was plaintiff's transfer from the Features Desk to the

Fold Desk in April 2005. Given the significant passage of time between either of these complaints and the April 2005 transfer, the temporal relationship is simply too attenuated to support a causal connection. Thus, in the absence of any other evidence, the court finds that no reasonable juror could find a causal connection between these events and as such her retaliation claim as it relates to the filing of this lawsuit and her complaint with the NYSDHR is dismissed.[11]

H.      State Law Claims

        i)      Negligent Infliction of Emotional Harm

        The plaintiff alleges a claim for negligent infliction of emotional harm. Defendants argue that this claim is barred by the exclusivity provisions of the New York Workers' Compensation Law ("WCL"), N.Y. Work. Comp. L. §§ 11 and 29(6), and cites several cases in support. (Defs.' Mem. at 32, citing Torres v. Pisano, 116 F.3d 625, 640 (2d Cir. 1997)(affirming dismissal of negligence claim as barred by the WCL); Gerson v. Giorgio Sant'Angelo Collectibles, 176 Misc.2d 388, 392, 671 N.Y.S.2d 958, 961 (Sup. Ct. N.Y. Co. 1998) (holding that plaintiff's negligent infliction of emotional distress claim arising from alleged sex discrimination was barred by the WCL). Plaintiff does not challenge the defendants' statement of the law; rather, the plaintiff simply contends that the court has jurisdiction over her state law negligence claim. (Pl.'s Mem. at 33-34).

        There is no question that the court has jurisdiction to determine the plaintiff's negligence claim pursuant to 28 U.S.C. § 1367 which permits supplemental jurisdiction over state law

---

[11] The defendants' articulated non-retaliatory reasons for its actions as well as the plaintiff's argument concerning pretext are discussed above (see supra at 17-19, 26-27) and do not alter this outcome.

claims.  On the other hand, the New York Workers' Compensation Law exclusive remedy doctrine bars an employee from bringing a negligence or gross negligence based claim against an employer . . . ."  Lauria v. Donahue, 438 F. Supp.2d 131, 141 (E.D.N.Y. 2006); Meletiche v. Holiday Inn Worldwide, Inc., No. 95 Civ. 6666 (BSJ), 1996 WL 239893 (S.D.N.Y. May 8, 1996); Chrzanowski v. Lichtman, 884 F. Supp. 751, 756 (W.D.N.Y. 1995), citing O'Brien v. King World Productions, Inc., 669 F. Supp 639, 641 (S.D.N.Y. 1987).

Courts in the Second Circuit applying this rule have routinely dismissed negligence claims brought by plaintiffs in the context of complaints alleging employment discrimination. See, e.g., Ferris v. Delta Air Lines, Inc., 227 F.3d 128, 138 (2d Cir. 2001) (In Title VII action affirming summary judgment dismissing negligent retention and supervision claims because they were precluded by the exclusive remedy provisions of the WCL); Torres, 116 F.3d at 640 (In race discrimination claim dismissing employee's common law negligence claim as barred by the WCL's exclusivity provision); Duran v. Jamaica Hospital, 216 F. Supp.2d 63, 66 (E.D.N.Y. 2002) (dismissing negligence claim as barred by WCL in context of Title VII complaint discrimination);  Persaud v. S. Axelrod Co., No. 95 Civ. 7849 (RPP), 1996 WL 11197 (S.D.N.Y. Jan. 10, 1996) (dismissing negligence claims as barred by WCL in context of plaintiff's  Title VII and NYSHRL complaint of employment discrimination); Gerson, 176 Misc.2d at 392, 671 N.Y.S.2d at 961 (dismissing former employee's claims of negligent infliction of emotional distress as barred by the WCL in context of complaint alleging sex discrimination under state and local human rights laws).  Thus, the negligence claim here is barred by the WCL and is dismissed.

### ii) Intentional Infliction of Emotional Harm

Finally, the plaintiff alleges a common law claim of intentional infliction of emotional harm ("IIED"). Defendants assert that the IIED claim should be dismissed because the plaintiff's allegations fall far short of the type of "extreme and outrageous" conduct required to establish an IIED claim.

Under New York law, the elements of a claim for IIED are: "(1) extreme and outrageous conduct; (2) intent to cause severe emotional distress; (3) a causal connection between the conduct and injury; and (4) severe emotional distress." Bender v. City of New York, 78 F.3d 787, 790 (2d Cir. 1996). While IIED does not proscribe specific conduct, the New York Court of Appeals has required that a plaintiff allege conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Murphy v. American Home Products Corp., 58 N.Y.2d 293, 461 N.Y.S.2d 232, 236, 448 N.E.2d 86, 90 (N.Y. 1993). "New York sets a high threshold for conduct that is considered 'extreme and outrageous' enough to constitute intentional infliction of emotional distress," Smalls v. Allstate Insurance Co., 396 F. Supp.2d 364, 375 (S.D.N.Y. 2005), and "[i]ntentional infliction of emotional distress is an extremely disfavored cause of action." Durant v. A.C.S. State and Local Solutions, Inc., No. 05-7303 (CM), 2006 WL 3199150, at *6 (S.D.N.Y. Nov. 1, 2006), citing Marley v. Ibelli, 203 F. Supp.2d 302, 311 (S.D.N.Y. 2001). Clearly, the allegations in the instant complaint fail to meet this high threshold and as such her claim is subject to dismissal on this basis alone. Additionally, however, the absence of adequate proof of severe emotional distress warrants dismissal of this claim. A plaintiff's claim of severe emotional distress must be supported by "medical evidence,

not just the mere recitation of speculative claims." <u>Calhoun v. Mastec, Inc.</u>, No. 03 Civ. 368S, 2006 WL 2806452 (W.D.N.Y. Sept. 28, 2006) (granting summary judgment dismissing plaintiff's IIED claim where record contained no medical evidence to support claim that he suffered mental distress as a result of being fired) (citation omitted). Here, plaintiff does not provide any evidence establishing that she suffered any mental distress much less *severe* mental distress. In the absence of such evidence, the plaintiff's IIED claim must fail. Accordingly, the defendants' motion for summary judgment as to this claim is granted and the plaintiff's IIED claim is dismissed.

## CONCLUSION

For the reasons stated above, the defendants' motion for summary judgment is granted in part and denied in part.


Dated:  Central Islip, New York          **SO ORDERED:**
       January 3, 2007

                                 _____
                                 ARLENE R. LINDSAY
                                 United States Magistrate Judge